Filed 9/5/23  P. v. Mendez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ROBERTO CABRERA MENDEZ,<br><br>    Defendant and Appellant. | G061352<br><br>(Super. Ct. No. 15NF1536)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gregg L. Prickett, Judge.  Affirmed.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

Roberto Cabrera Mendez appeals from a judgment of conviction of second degree murder with a firearm sentencing enhancement following a jury trial. Mendez contends on appeal the trial court erred by failing to instruct the jury with a proposed pinpoint instruction and by permitting testimony regarding an uncharged crime. As explained, *post*, we conclude the trial court did not err, and we therefore affirm.

FACTUAL BACKGROUND

I.

THE SHOOTING OF VICTOR NEGRETE

Sometime between 10:00 and 11:00 p.m. on May 27, 2015, Victor Negrete was pushing a shopping cart down Rio Vista Street in Anaheim. Negrete had short hair, was dressed in baggy clothes, and had multiple tattoos indicating his membership in the Lennox criminal street gang. Mendez and Ricardo Hernandez, both members of the Underhill criminal street gang, and an unidentified third man were walking down Rio Vista Street together; all wore baggy clothes and one of the men was carrying a skateboard. After the third man took off running down the street with the skateboard, Mendez and Hernandez approached Negrete. The men began arguing and gesturing. Hernandez ran off down the street, but Mendez and Negrete continued to argue.

Mendez pulled a firearm from his pocket and shot Negrete multiple times. As Negrete collapsed to the sidewalk, Mendez ran away in the same direction as had Hernandez and the third man. Negrete died of multiple gunshot wounds.

A couple, who had witnessed the argument and shooting from a car parked close by, called 911 and then drove to a nearby park where they saw two of the men involved in the shooting. One of these witnesses, the passenger who had had a clear look at both their faces, identified Mendez and Hernandez from a photo lineup. She described the shooter (Mendez) as a light-skinned Hispanic male, five feet four or five inches in

2

height, with a short military-style haircut.  She described Hernandez as a light-skinned Hispanic male with short black hair and glasses.

The driver of the car described the individual originally carrying the skateboard as a light-skinned Hispanic male in his twenties, 5 feet 10 or 11 inches in height, slim, and wearing baggy clothes, shorts, and high white socks.  The man who took off running with the skateboard was also 5 feet 10 or 11 inches, about 200 pounds, with longer slicked back hair, glasses, and a moustache.  The shooter was shorter, had very short hair to the point it appeared his head was shaved, and had a "rough moustache."  The driver identified both Mendez and Hernandez from a photo lineup.

A third witness was driving by when the shooting happened.  She pulled over and tried to help Negrete.  Although she could not identify any of the three men, she told police the shooter was wearing dark clothing and had a bald head.  After shooting Negrete, he ran in the same direction as the others.

## II.

### MENDEZ'S DNA IS FOUND ON THE MURDER WEAPON

About one week later, police executed a search warrant at the home of Federico Quintanilla.  Quintanilla was also a member of the Underhill criminal street gang.  A revolver stipulated to be the murder weapon was found in a bag on a kitchen chair.  Police also found mail addressed to Mendez in one of the bedrooms.  Mendez was determined to be a major contributor of DNA found on the trigger of the revolver.

## III.

### EVIDENCE OF UNCHARGED CRIMES

E.M. testified about an incident involving Mendez and Hernandez occurring nine days before Negrete's murder.  E.M. and a friend were approached by Mendez while walking home, in the same neighborhood in which Quintanilla lived.  Mendez whistled and about 10 other men appeared, including Hernandez.

3

Mendez asked E.M.'s friend where they were from, and the friend replied he lived there. Mendez said this area "belonged to [Mendez's group]" and E.M. and his friend "were not allowed to be there." Mendez mentioned Underhill, but E.M. did not know what that meant. E.M. testified Mendez was a light-skinned Hispanic male, who was a little taller than five feet five inches. About a month later, E.M. picked Mendez out of a photo lineup.

IV.

GANG EVIDENCE

A gang expert testified at trial that, as of May 27, 2015, Negrete was a member of the Lennox criminal street gang and Quintanilla and Hernandez were active participants of the Underhill criminal street gang. Based on his prior gang contacts with the police, his gang tattoos, the incident with E.M., and a gang-related incident after Negrete's murder where Mendez flashed gang signs at passing cars, the gang expert opined Mendez was an active participant in the Underhill criminal street gang as of May 27, 2015. Negrete's murder occurred outside the territory claimed by the Underhill gang. The gang expert opined Negrete's murder was for the benefit of the Underhill criminal street gang.

V.

MENDEZ'S TESTIMONY

Mendez testified on his own behalf and admitted he had engaged in four instances of felony conduct that reflected on his credibility. Mendez testified he, Hernandez, and Quintanilla were hanging out, smoking marijuana, and drinking in his friend's cousin's garage on May 27, 2015. Quintanilla told Mendez he was going to go pick up a gun. Mendez was unable to get a ride back to where he was staying, so he began walking away alone. Mendez's gang tattoos were exposed and visible. While he was walking down Rio Vista Street, Quintanilla and Hernandez caught up to Mendez; Quintanilla was on a skateboard and Hernandez was on foot. Together, the three passed

4

Negrete pushing a shopping cart. Quintanilla told Mendez that Negrete had said something to him, handed Mendez his skateboard, and walked back toward Negrete. Mendez yelled to Quintanilla to come back, but Quintanilla did not respond. Quintanilla approached Negrete and they began arguing.

Mendez did not want "to get caught up in anything" and took off running. Mendez heard what sounded like gunshots, but he did not look back. Mendez claimed he did not see the shooting and did not know whether Quintanilla had been shot; he only realized it was Negrete and not Quintanilla who had been shot when he saw Quintanilla the next day. Mendez testified he did not return to check on Quintanilla after hearing the shots and did not act as back up for his fellow gang member.

The next day, Mendez hung out with Hernandez and Quintanilla. Quintanilla told Mendez not to tell anyone about the shooting.

Mendez admitted he and Quintanilla were members of the Underhill criminal street gang but claimed Hernandez was not. Mendez had tattoos of Underhill and Anaheim on his head and elsewhere. Mendez claimed to have pulled the trigger on the revolver (after ensuring it was unloaded) several days before the murder, explaining why his DNA was on the trigger.

Regarding the incident with E.M., Mendez testified E.M.'s friend approached him and asked if Hernandez was his bodyguard. Mendez asked E.M.'s friend where he was from and told him he should not be there because it was Mendez's neighborhood. Mendez testified his friends arrived on their own and he did not whistle for them. Mendez and his friends and E.M. and his friends began fighting. Mendez did not hit E.M., but his friends and fellow gang members did. Mendez admitted hitting E.M.'s friend and lying to the police about this incident.

Mendez denied verbally confronting or shooting Negrete.

PROCEDURAL HISTORY

Mendez was charged with a single count of murder.  (Pen. Code, § 187, subd. (a).)  It was alleged Mendez committed the offense for the benefit of a criminal street gang (*id.*, §§ 186.22, subd. (b)(4), 190.2, subd. (a)(22)) and that in committing the offense he personally discharged a firearm and was a principal in the commission of an offense committed for the benefit of a gang with the use of a firearm (*id.*, § 12022.53, subds. (d), (e)(1)).  A jury found Mendez guilty of second degree murder and found true the allegation he personally discharged a firearm while committing the murder.  The jury could not reach a verdict on the gang allegations.

The trial court sentenced Mendez to a total term of 40 years to life: 15 years to life for murder and a consecutive term of 25 years to life for the firearm enhancement.  Mendez appealed.

DISCUSSION

I.

PINPOINT INSTRUCTION

A.  *Principles of Law and Standard of Review*

"'The trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense.'"  (*People v. Rivera* (2019) 7 Cal.5th 306, 332.)  The court must also instruct on "'general principles of law that are closely and openly connected with the facts before the court and necessary for the jury's understanding of the case.'"  (*People v. Simon* (2016) 1 Cal.5th 98, 143.)

"'Under appropriate circumstances, "a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case . . . ."'"  (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 220.)  Pinpoint instructions "'relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case.'"  (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.)  Parties are entitled to legally correct and factually

warranted pinpoint instructions, should they request such additional instructions. (*People v. Hughes* (2002) 27 Cal.4th 287, 362.) However, a trial court may properly refuse to give a pinpoint instruction that "incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence." (*People v. Moon* (2005) 37 Cal.4th 1, 30.)

We review claims of instructional error de novo. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.] '"In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given."'" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

B. *The Requested Instruction*

Mendez offered the following pinpoint instruction: "You have heard evidence that a person other than the defendant[,] Federico Quintanilla[,] committed the offense with which the defendant is charged. The defendant is not required to prove Federico Quintanilla's guilt. It is the prosecution that has the burden of proving the defendant guilty beyond a reasonable doubt. Therefore, the defendant is entitled to an acquittal if you have a reasonable doubt as to the defendant's guilt. Evidence that Federico Quintanilla committed the charged offense may by itself leave you with a reasonable doubt as to the defendant's guilt. However, its weight and significance, if any, are matters for your determination. If after considering all of the evidence, including any evidence that another person committed the offense, you have a reasonable doubt that the defendant committed the offense, you must find the defendant not guilty."

The trial court refused to instruct the jury with the pinpoint instruction because parts of the instruction were duplicative of the standard instructions on the presumption of innocence, reasonable doubt, the prosecution's burden of proof, and the

7

involvement of others in the crime, and the other parts were "contrary to the law." As for the involvement of another person in the crime, the court instructed the jury with CALCRIM No. 373, as follows: "The evidence shows that another person or other persons may have been involved in the commission of the crime charged against the defendant. There may be many reasons why someone who appears to have been involved might not be a codefendant in this particular trial. You must not speculate about whether that other person or those other persons have been or will be prosecuted. [¶] Your duty is to decide whether the defendant on trial here committed the crime charged." The court also instructed the jury with CALCRIM No. 220 regarding reasonable doubt, the presumption of innocence, and the prosecution's burden of proof, and CALCRIM No. 520 regarding the prosecution's burden to prove all elements of malice aforethought murder.

C. *The Trial Court Was Not Required to Use Mendez's Proposed Pinpoint Instruction*

We agree with Mendez the proposed pinpoint instruction was supported by substantial evidence, did not misstate the law, and was generally not argumentative. In his opening brief, Mendez explains away any argumentation as follows: "Here, by way of contrast, the proffered instruction merely inserted the name of the third party at issue and stated the well-established principles of law that the defendant was not required to prove his guilt and that if evidence of that party's guilt raised a reasonable doubt as to [Mendez]'s culpability, [Mendez] was entitled to an acquittal." But that explanation of the purpose of the pinpoint instruction shows why the trial court correctly refused to give it to the jury: The proposed pinpoint instruction merely reiterated the basic principles of law set forth in other standard instructions, while tying them directly to the individuals in this case. The instruction was duplicative of other instructions and properly denied.

In *People v. Sears* (1970) 2 Cal.3d 180, cited by Mendez, the appellate court concluded the trial court had erred by refusing to give a pinpoint instruction "that directs attention to evidence from a consideration of which a reasonable doubt of his guilt

8

could be engendered." (*Id.* at p. 190.) "A defendant is entitled to an instruction relating particular facts to any legal issue." (*Ibid.*)

But "[a]n instruction that does no more than affirm that the prosecution must prove a particular element of a charged offense beyond a reasonable doubt merely duplicates the standard instructions defining the charged offense and explaining the prosecution's burden to prove guilt beyond a reasonable doubt. Accordingly, a trial court is required to give a requested instruction relating the reasonable doubt standard of proof to a particular element of the crime charged only when the point of the instruction would not be readily apparent to the jury from the remaining instructions." (*People v. Bolden* (2002) 29 Cal.4th 515, 558–559.)

We reject Mendez's argument that if the jury is not instructed on third party culpability there is a danger the jury will conclude the third party's actual culpability must be proved by defendant. We determine whether an instruction is correct based on the entire charge of the court, and not by individual instructions or parts of instructions. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1001–1002.) There is no indication the jury here had any difficulty understanding the prosecution's burden of proof. "'We presume jurors understand and follow the instructions they are given.'" (*Id.* at p. 1008.) No instruction was given from which the jury could reasonably have inferred defendant had any burden whatsoever.

D. *Any Error Was Harmless*

Even if the trial court erred by refusing Mendez's proposed pinpoint instruction, the error was harmless. In order to prove prejudice based on the failure to give a pinpoint instruction, a defendant must establish a reasonable probability of a better outcome without the error. (*People v. Earp* (1999) 20 Cal.4th 826, 887, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) In *People v. Earp, supra*, at page 887, the defendant requested a pinpoint instruction reading: "'Evidence has been offered that a third party is the perpetrator of the charged offense. It is not required that the defendant prove this fact

9

beyond a reasonable doubt.  In order to be entitled to a verdict of acquittal, it is only required that such evidence raise a reasonable doubt in your minds of the defendant's guilt.'"  The trial court's refusal to give this instruction resulted in no prejudice to the defendant in *Earp*.  (*Ibid*.)  The jury was instructed the prosecution bore the burden of proof beyond a reasonable doubt and knew from defense counsel's argument the defense theorized the crimes had been committed by another specified individual.  (*Ibid.*)

In *People v. Hartsch* (2010) 49 Cal.4th 472, the defendant proposed two pinpoint instructions regarding third party culpability.  The Supreme Court concluded the trial court did not prejudicially err by refusing them.  "We have noted that similar instructions add little to the standard instruction on reasonable doubt.  [Citation.]  We have also held that even if such instructions properly pinpoint the theory of third party liability, their omission is not prejudicial because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof.  [Citations.]

"Here, defendant's proposed instruction . . . simply restated the reasonable doubt standard in connection with the possibility that one or more others might be guilty parties.  The omission of this instruction, if error, could not have affected the verdict.  It is hardly a difficult concept for the jury to grasp that acquittal is required if there is reasonable doubt as to whether someone else committed the charged crimes.  The closing arguments focused the jury's attention on that point." (*People v. Hartsch, supra*, 49 Cal.4th at p. 504; see *People v. Fayed* (2020) 9 Cal.5th 147, 176–178 [even where parties stipulate to the admissibility of third party culpability evidence, the failure to instruct on third party culpability was not prejudicial when jury was instructed on reasonable doubt].)

In *People v. Gutierrez* (2009) 45 Cal.4th 789, 824–825, the Supreme Court concluded a third party culpability instruction was not necessary when the jury was

10

properly instructed on the presumption of innocence and the government's burden to prove the defendant's guilt beyond a reasonable doubt, and when the jury could have acquitted the defendant if it believed a third party was responsible for the victim's death. The Supreme Court further concluded any error in failing to give a third party culpability instruction was harmless because "there is no reasonable probability that the result would have been different in light of the other instructions provided to the jury." (*Ibid.*)

The jury here was instructed both before trial and before deliberation regarding reasonable doubt, the presumption of innocence, and the prosecution's burden of proof. During closing argument, Mendez's counsel focused on Quintanilla as the real killer and the burden of proof:

"But it illustrates the presumption of innocence and the burden of proof. You have to say, still right now, Mr. Mendez is innocent. So when you look at what happened on the sidewalk, unless it's been proven to you beyond a reasonable doubt that something else was the case, you have to presume Mr. Mendez innocent. You have to presume that he didn't hit up Mr. Negrete, until it's proven to you beyond a reasonable doubt that he did or was part of a hit-up. [¶] . . . [¶]

"The People have to exclude every reasonable doubt. Every reasonable inference has to be excluded. What that means is I've been arguing, Federico Quintanilla was the shooter. Federico Quintanilla is a hothead. Federico Quintanilla went straight from the shooting to the drive-thru at McDonald's and he wasn't after a Big Mac, he was after another fight, he was—and he was going to shoot another guy or punch another guy if that guy said the wrong thing.

"I think that's the only reasonable conclusion you can draw. But it doesn't matter if it isn't. I don't have to prove anything to you. If I give you that reasonable explanation and they can't exclude it, if they can't say it's unreasonable, then they can't prove their case to you beyond a reasonable doubt. They can't . . . prove their case to you Roberto Mendez was the shooter and not Federico Quintanilla."

11

Mendez claims his counsel's ability to argue third party culpability did not solve the problem because the jury had to follow the law from the court not counsel. But the court specifically instructed the jury it must find the prosecutor proved each element of the crime beyond a reasonable doubt in order to convict. If the jury accepted the argument Quintanilla was the killer, it would have acquitted Mendez. Only by making a finding Mendez was the actual killer and Quintanilla was not could the jury have convicted Mendez.

Mendez also argues the error, if any, was prejudicial because this was a close case. If the proposed instructions are duplicative of the instructions actually given, the strength of the evidence is irrelevant. (See cases cited *ante*.)

II.

TESTIMONY OF UNCHARGED CRIMES

Mendez next argues the trial court erred by allowing E.M.'s testimony regarding the incident between Mendez and his friends, and E.M. and his friends, on the ground that testimony was more prejudicial than probative.

A. *General Principles of Law and the Standard of Review*

While Evidence Code section 1101, subdivision (a) prohibits admission of evidence of specific instances of uncharged misconduct by a defendant to prove the defendant's conduct on a specified occasion, subdivision (b) permits such evidence when it is relevant to establish a fact other than the defendant's character or disposition. (*People v. Pineda* (2022) 13 Cal.5th 186, 221.) ""Evidence that a defendant committed crimes other than those for which he is on trial is admissible when it is logically, naturally, and by reasonable inference relevant to prove some fact at issue, such as motive, intent, preparation or identity. [Citations.] The trial court judge has the discretion to admit such evidence after weighing the probative value against the prejudicial effect."" [Citation.] When reviewing the admission of other crimes evidence to show motive, "'a court must consider: (1) the materiality of the fact to be proved or

12

disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant."'" (*People v. Johnson* (2022) 12 Cal.5th 544, 610.)

The trial court has the discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "'"[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose."'" (*People v. Powell* (2018) 6 Cal.5th 136, 162–163.)

"Because all other crimes evidence in a sense may be viewed as 'inherently prejudicial' [citation], '"uncharged offenses are admissible only if they have *substantial* probative value."'" (*People v. Rogers* (2013) 57 Cal.4th 296, 331.)

"Even if evidence of other crimes is relevant under a theory of admissibility that does not rely on proving disposition, it can be highly prejudicial. 'Regardless of its probative value, evidence of other crimes always involves the risk of serious prejudice . . . .' [Citation.] Therefore, the law places other restrictions on its admissibility. If evidence is 'merely cumulative with respect to other evidence which the People may use to prove the same issue,' it is excluded under a rule of necessity." (*People v. Thompson* (1980) 27 Cal.3d 303, 318.)

"We review a trial court's decision to admit evidence under Evidence Code sections 1101 and 352 for abuse of discretion. [Citations.] We do not disturb the trial court's ruling unless it was arbitrary, capricious, or made in a '"patently absurd manner

13

that resulted in a manifest miscarriage of justice."'"" (*People v. Thomas* (2023) 14 Cal.5th 327, 358.)

B. *The Issue Has Not Been Forfeited*

The Attorney General initially argues this challenge has been forfeited because Mendez objected before trial to admission of any evidence regarding the encounter between Mendez, E.M., and their respective friends, but did not object again when the court decided to admit evidence of the encounter but not of the fistfight, or later when Mendez testified on cross-examination. Mendez did object through counsel when, on cross-examination, the prosecution began delving into the specifics of the fight. Indeed, Mendez moved for a mistrial based on the prosecutor's questioning of him regarding this incident. We conclude the issue was not forfeited.

C. *The Trial Court Did Not Err by Admitting the Evidence of the Fight*

At trial, the prosecutor contended the evidence of the fight between Mendez and his friends and E.M. and his friends was relevant for four purposes: (1) to demonstrate Mendez's proximity to the location where the murder weapon was later found; (2) to support the gang expert's testimony Mendez was an active gang member and the shooting of Negrete was gang-related; (3) to strengthen the reliability of the evidence of Mendez's identity by connecting him to Hernandez; and (4) to provide a gang motive and show Mendez's knowledge of gang territory and willingness to act on behalf of the gang. On review, we conclude the trial court could have based its decision to admit the evidence on any of these grounds, and therefore there is no abuse of discretion.

The evidence established Mendez was very near Quintanilla's home on May 18, 2015. The gun used to murder Negrete on May 27 was found at Quintanilla's home on June 4. The evidence of Mendez's involvement in an incident close in time and location to the murder was more probative than prejudicial.

14

The evidence also helped establish Mendez was an active gang member. Other evidence was admitted establishing Mendez was a gang member between 2011 and October 17, 2014, and then again on June 2, 2015. Mendez, however, testified he was trying to get away from the area and the gang as of May 28, 2015. Evidence of his participation in a gang-related event close in time to the murder tended to refute his claim.

The passenger in the car parked near the site of Negrete's murder identified Mendez as the murderer and Hernandez as his companion. Evidence these two had also been together nine days before the murder strengthened the witness's identification from the night of the murder. That there were eight or 10 presumed gang members at the incident involving E.M. who were not at the scene of Negrete's murder was appropriate for the jury to consider in determining how much weight to give the evidence, but does not make the evidence inadmissible, contrary to Mendez's argument.

Finally, the prosecutor offered the evidence of the fight with E.M. and his friends to establish an alleged motive for the murder of Negrete—to challenge a rival gang member. The E.M. assault was an act of gang activity, with a classic "hit up," throwing gang signs, and a crowd of gang members, which occurred within the Underhill criminal street gang's claimed territory. In the present case, however, there was no hit up, no throwing of gang signs, only three gang members, two of whom ran away before the shooting, were involved, and the murder occurred outside the Underhill gang's claimed territory. As the Attorney General argues, the evidence showed Mendez "had a clear understanding of how his gang operated, and that he would act on behalf of his gang." Although there were no direct similarities between how the attacks on Negrete and on E.M. and his friends were committed, we agree with the trial court the evidence was more probative than prejudicial.

Overall, we conclude the trial court's decision to admit evidence of the incident with E.M. was not arbitrary and capricious, and there was no error.

15

III.

THERE WAS NO CUMULATIVE ERROR

Mendez contends the cumulative harm of the alleged errors argued above was prejudicial.  "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error."  (*People v. Hill* (1998) 17 Cal.4th 800, 844.)

As we have explained, any error regarding the pinpoint instruction was not prejudicial, and the trial court did not err by admitting E.M.'s testimony.  Mendez was not deprived of due process or of a fair trial.  (*People v. Roberts* (2021) 65 Cal.App.5th 469, 482.)

DISPOSITION

The judgment is affirmed.


MOTOIKE, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.


16